**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **CAROL L. BAKER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:11-CV-3497-M-BH** |
| | § | |
| **CAROLYN W. COLVIN, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are *Plaintiff's Motion for Summary Judgment*, filed March 23, 2012 (doc. 17), and *Defendant's Motion for Summary Judgment*, filed April 23, 2012 (doc. 20).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED** in part, Defendant's motion is **DENIED** in part, and the case is **REMANDED** to the Commissioner for further proceedings.

**I.  BACKGROUND**[1]

**A.      *Procedural History***

Carol L. Baker (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability benefits under Title II of the Social Security Act.  (R. at 1-3.)  She applied for disability insurance benefits in October 2006, alleging disability beginning July 3, 2006, due to chronic back and neck pain, depression, anxiety, narcolepsy, and Graves' disease.  (*Id*. at 241.)  Her claims were denied initially and upon reconsideration.  (*Id*. at 184-187, 190-94.)  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and

---

[1]   The background comes from the transcript of the administrative proceedings, which is designated as "R."

personally appeared and testified at a hearing held on September 16, 2008. (*Id*. at 44-45, 196.) On

January 6, 2009, the ALJ issued a decision finding Plaintiff not disabled. (*Id*. at 171-78.) Plaintiff

appealed, and the Appeals Council accepted her request for review. (*Id*. at 237-52.) On July 7,

2009, the Appeals Council remanded for review based on the ALJ's failure to consider evidence

related to Plaintiff's alleged mental impairments. (*Id*. at 179-182.) On July 1, 2010, Plaintiff

personally appeared and testified at a supplemental hearing. (*Id*. at 94-95.) On August 24, 2010, the

ALJ issued a decision finding Plaintiff not disabled. (*Id*. at 13-35.) Plaintiff appealed, and the

Appeals Council denied her request for review, making the ALJ's decision the final decision of the

Commissioner. (*Id*. at 1-9.) Plaintiff timely appealed the Commissioner's decision to the United

States District Court pursuant to 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.**     ***Factual History***

    **1.**     **Age, Education, and Work Experience**

Plaintiff was born in 1955. (R. at 51.) She has a GED and three associate's degrees. (*Id*.)

She has past relevant work experience as a nail technician, and she owned a beauty salon. (*Id*. at 53,

82-83.) She also worked as a corrections officer and sergeant at a federal holding facility from June

2004 until July 3, 2006. (*Id*. at 53-56, 78.)

    **2.**     **Psychological and Psychiatric Evidence**[2]

On January 8, 2001, Plaintiff saw Dr. G.E. Wingham for headache, pain across her shoulders,

and in her left arm and hand, as well as depression, frustration, anger, confusion and memory loss.

---

[2]   The administrative record in this case contains a substantial amount of medical evidence relating to
Plaintiff's physical limitations, some of which predated the evidence of her mental limitations. Because the two
issues in this appeal concern Plaintiff's mental limitations, the recitation of medical evidence is limited to the
relevant psychological and psychiatric evidence.

(*Id*. at 476, 481-86.)  She reported that she was receiving therapy for her emotional problems.  (*Id*.)  Dr. Wingham diagnosed Plaintiff with a herniated disc.  (*Id*. at  484.)

On January 5, 2005, Plaintiff saw Dr. M. Ricardo C. Schack; she complained about her work environment and reported that she slept poorly and had insomnia.  (*Id*. at 1274.)  She reported that she had taken Paxil before and it helped.  (*Id*.)  Dr. Schack diagnosed her with recurrent major depression and a history of hypothyroid disorder.  (*Id*.)  He assigned her a global assessment of functioning score (GAF)[3] of 55 and prescribed Paxil and Xanax.  (*Id*.)  Plaintiff saw him again on February 2, 2005, for anxiety.  (*Id*. at 716.)  He renewed her prescriptions for Paxil and Xanax, and prescribed Synthroid.  (*Id*.)  She saw him again on March 30, 2005, for work-related stress.  (*Id*. at 716.)  He increased her Xanax dosage, decreased her Paxil dosage, and again prescribed Synthroid.  (*Id*.)  On May 5, 2005, she reported that she was feeling better overall, and he refilled her prescriptions.  (*Id*.)  On July 13, 2005, she reported that the Xanax was effective, and he continued her medications.  (*Id*.)  On December 14, 2005, Plaintiff reported to Dr. Schack that she was dealing with neuropathy but was doing well, except that she was tired.  (*Id*.)  He continued her medications and added Cymbalta for pain.  (*Id*.)

On March 9, 2006, Plaintiff saw Dr. Horace Hinson for fatigue.  (*Id*. at 757.)  She also reported symptoms of anxious mood, decreased ability to concentrate, and weight gain as well as a history of migraines, chronic obstructive pulmonary disease, depression, Graves' disease, and panic attacks.  (*Id*. at 757-58.)  Her medications included Synthroid, Xanax, and Paxil.  (*Id*. at 758.)  Dr. Hinson diagnosed her with fatigue and acquired hypothyroidism.  (*Id*. at 759.)  He continued her

---

[3]  GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health.  *Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).  A GAF score of forty indicates major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") p. 32 (4th ed. 1994).

medications. (*Id*.) Plaintiff saw Dr. Hinson again on March 15, 2006, for hypothroidism. (*Id*. at 754.) She reported depression, dry skin, edema, fatigue, menstrual irregularities, pedal edema, weakness, and weight gain. (*Id*.) Her medications included Synthroid, Xanax, and Paxil. (*Id*. at 755.) Dr. Hinson instructed her to continue taking her medications. (*Id*.) On April 12, 2006, Plaintiff saw him again for abdominal pain and depression. (*Id*. at 751.) Plaintiff also complained of fatigue that had lasted more than a year. (*Id*.) She reported crying spells and decreased ability to concentrate. (*Id*.) Dr. Hinson prescribed Nexium, Bentyl, Vicodin, and Paxil, and referred her to a sleep specialist for an apnea evaluation. (*Id*.) She returned on May 11, 2006, complaining of headaches. (*Id*. at 749-750.) Her medications included Paxil, Synthroid, and Xanax. (*Id*.) Dr. Hinson diagnosed tension headaches. (*Id*. at 750.) He recommended exercises for her neck, moist heat, and massage, and that she avoid heavy lifting, reaching or activities that increased her pain. (*Id*.) He prescribed Paxil and Midrin. (*Id*.)

On June 6, 2006, Plaintiff saw Dr. Robert R. Springer to review the results of a May 18, 2006 sleep study. (*Id*. at 718.) He noted that she was sleepy, and her affect was depressed. (*Id*. at 718-20.) He diagnosed obstructive sleep apnea, psychophysiological insomnia and idiopathic hypersomnia. (*Id*. at 719.) He prescribed Provigil. (*Id*.)

On June 12, 2006, Plaintiff saw Dr. Hinson. (*Id*. at 745.) He continued her medications, which included Paxil, Synthroid, Midrin, Provigil, Rozerem, and Xanax. (*Id*.) She returned to see him on December 4, 2006. (*Id*. at 743.) He again continued her medications and instructed her to take them as directed. (*Id*.)

On January 10, 2007, Plaintiff visited Adapt of Texas. (*Id*. at 1190-95.) She reported her current medications as Paxil and alprazolam. (*Id*. at 1190.) She described prior treatment by Drs. Schack and Hinson. (*Id*.) Adapt scheduled a psychiatric evaluation for February 22, 2007. (*Id*.)

4

On January 11, 2007, Plaintiff saw Dr. Mahmood Panjwani for a consultative examination. (*Id*. at 776-781.)  She reported a history of chronic low back and neck pain, narcolepsy/sleeping disorder, depression, anxiety, and Grave's disease.  (*Id*. at 776)  She had taken antidepressants for a long time, but she still had frequent crying spells and did not want to leave her room.  She reported difficulty with concentration, focus and forgetfulness, frequent panic attacks, angry outbursts, and sleep problems.  (*Id*. at 777.)  People made her nervous and she did not enjoy any activities.  (*Id*.)  She listed her medications as Paxil, Xanax and Synthroid.  (*Id*.)  Dr. Panjwani noted that she was awake, alert, oriented, and in no acute distress.  (*Id*. at 779.)  Dr. Panjwani diagnosed chronic low back and neck pain, narcolepsy/sleeping disorder, depression, anxiety, and a history of Graves' disease.  (*Id*.)

On February 5, 2007, Plaintiff visited Hope Clinic with a thyroid complaint.  (*Id*. at 1217-18.)  She reported a history of thyroid problems, bipolar disorder and narcolepsy, and her medications included Synthroid, Paxil, and Xanax.  (*Id*. at 1218.)  Her affect was noted as flat.  (*Id*.)

On February 6, 2007, Plaintiff saw J. Lawrence Muirhead, Ph.D., for a mental status exam. (*Id*. at 785-789.)  She described a history of mental health treatment extending back to 1995.  (*Id*. at 785.)  Her doctor prescribed Paxil and alprazolam for symptoms of depression and anxiety, and she continued to take both medications.  (*Id*. at 786.)  Plaintiff reported that her anxiety improved with medication, but she still had daily weeping spells, variable energy and concentration levels, and reduced frustration tolerance.  (*Id*.)  Her sleep disorder aggravated her mood disorder.  (*Id*.)  She disclosed a suicide attempt at age 16 and past alcohol abuse, but she denied recent alcohol use.  (*Id*.)  She denied suicidal preoccupation, and her depressive content  centered around unemployment and health problems.  (*Id*.)

Plaintiff reported that she was divorced, had been married six times, and had two adult

children.  (*Id*.)  She had lived with her father and stepmother since losing her job.  (*Id*.)  She had a

driver's license and still drove, but she was afraid of falling asleep while driving.  (*Id*.)  She dressed

and groomed herself.  (*Id*.)  She could perform light household chores but avoided heavy chores due

to her back problem.  (*Id*.)  Plaintiff reported that she could manage money and shop at local stores.

(*Id*.)  She was able to read, and use the mail service and telephone directories.  (*Id*. at 788.)  She had

no friends, was not involved in any group activities, and described herself as a loner who spent her

time looking for a job and caring for her father and stepmother.  (*Id*.)  She enjoyed reading and

spending time on the computer.  (*Id*.)

Dr. Muirhead noted that Plaintiff was dressed casually and attendant to hygiene.  (*Id*.)  Her

speech was normal.  (*Id*.)  She was polite and cooperative, but her mood was mildly dysphoric, and

her affect was restricted.  (*Id*.)  )  Her judgment was partially compromised by her dysphoric mood.

(*Id*.)  Dr. Muirhead described Plaintiff's thought processes as relevant and goal directed, and he

noted that she stayed on topic during the interview.  (*Id*.)  She reflected good conceptual

development in her thought processes, and her intelligence seemed average.  (*Id*.)  Her immediate

memory was average, as she could repeat 7 digits forward and 4 digits backward.  (*Id*.)  However,

she could not recall any of 3 items after a five-minute delay.  (*Id*.)  She was able to recall her birth

date, the date of the evaluation, and the purpose of the evaluation.  (*Id*.)  She said she could not find

a job because she would fall asleep if she took a sedentary position.  (*Id*.)

Dr. Muirhead diagnosed Plaintiff with an Axis I dysthymic disorder, in partial remission, and

an Axis II personality disorder.  (*Id*. at 789.)  His Axis III diagnoses were sleep apnea, lumbar

complaint, acid reflux, chronic headache, respiratory ailment, urinary incontinence and a thyroid

disorder.  (*Id*.)  On Axis IV, he listed unemployment as a psychosocial stressor and assigned her an

Axis V GAF of 65.  (*Id*.)

On February 22, 2207, Adapt conducted a psychiatric evaluation of Plaintiff.  (*Id*. at 1174-77.)  She presented in an irritable and ruminative mood and reported that she took Paxil and Xanax and had suffered from depression and anxiety most of her life.  (*Id*. at 1175-76.)  She had seen Drs. Schack and Hinson previously.  (*Id*. at 1176.)  She described a history of physical and sexual abuse and stated she had been hospitalized at ages 22 and 24.  (*Id*. at 1176.)  She complained of irritability, daily panic attacks, and persistent anger.  (*Id*. at 1174-75.)  She ate once a day and slept only 2 hours.  (*Id*. at 1174.)  She admitted suicidal and homicidal thoughts but denied any definite plan.  (*Id*.)  She isolated herself from others by choice and reported not bathing for 2 weeks or longer.  (*Id*.)

Plaintiff's appearance was fair and she was appropriately dressed, but she appeared guarded, angry, and anxious.  (*Id*. at 1177.)  Her movement and speech were within normal limits.  (*Id*.)  Her affect was depressed and irritable, and her thoughts were rambling and ruminative.  (*Id*.)  Her thought content was abstract and hopeless.  (*Id*.)  She reported hearing voices and seeing leprechauns in her sleep.  (*Id*.)  She felt paranoid and controlled.  (*Id*.)  Plaintiff was oriented as to place, date and situation.  (*Id*.)  In a test of her immediate memory, she could recall 3/3 items.  (*Id*.)  On a test of her delayed recall, she recalled 1/3 items after 5 minutes and with cues, 2/3 items.  (*Id*.)  Plaintiff displayed fair concentration and insight, but her intelligence seemed below average.  (*Id*.)  She displayed good judgment.  (*Id*.)  Plaintiff was diagnosed with severe major depressive disorder with psychosis, panic disorder, and possible bi-polar disorder.  (*Id*. at 1178.)  Adapt also noted her diagnoses of narcolepsy and Graves' disease.  (*Id*.)  Her GAF score was 40.  (*Id*.)

On February 27, 2007, Dr. Robert White, a state agency medical consultant (SAMC), completed a psychiatric review technique (PRT) form for the period July 3, 2006 through February 27, 2007.  (*Id*. at 790-806.)  On Part I of the form, he noted the need for a residual functional capacity (RFC) assessment.  (*Id*. at 790.)  He opined that Plaintiff had a depressive syndrome

characterized by decreased energy, and dysthymic disorder in partial remission, and a personality disorder reflected by inflexible and maladaptive personality traits that caused either significant impairment in social or occupational functioning or subjective distress. (*Id*. at 793, 797.) Plaintiff was mildly limited in her daily living activities of daily living, and she was moderately limited in maintaining social functioning and in maintaining concentration, persistence, or pace. (*Id*. at 800.) He opined that she had no episodes of decompensation of extended duration. (*Id*.) He concluded that the medical evidence of record did not entirely support her alleged limitations. (*Id*. at 802.)

Dr. White also completed a mental RFC assessment on February 27, 2007. (*Id*. at 804.) In his Summary Conclusions, he concluded that Plaintiff was not significantly limited as to understanding and memory. (*Id*. at 804.) She was moderately limited in three areas related to sustained concentration and persistence, e.g., the ability to maintain attention and concentration for extended periods, the ability to work in coordination with or proximity to others without being distracted by them, and the ability to complete a normal workday and work week without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id*. at 804-05.) He concluded she was not significantly limited in all other areas related to sustained concentration and persistence. (*Id*. at 804-05.) He indicated that Plaintiff was moderately limited in her ability to accept instruction and respond appropriately to criticism from supervisors, and in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id*. at 805.) She was not significantly limited in all other areas of social interaction. (*Id*.) Dr. White opined that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, but she was not significantly limited in all other areas related to adaptation. (*Id*.) In his Functional Capacity Assessment, he stated that Plaintiff could understand, remember and carry out complex instructions,

make decisions, attend and concentrate for extended periods, accept instructions and respond appropriately to changes in a routine work setting.[4]  (*Id*.)  Dr. White's RFC Assessment did *not* include any opinions regarding Plaintiff's ability to work in coordination with or proximity to others without being distracted by them, the ability to complete a normal workday and work week without interruptions from psychologically based symptoms, or to perform at a consistent pace without an unreasonable number and length of rest periods.  His RFC assessment also did not address Plaintiff's ability to respond appropriately to criticism from supervisors or her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.[5]  (*Id*.)

On February 28, 2007, Plaintiff visited Adapt, claiming she was stressed.  (*Id*. at 1156.)  Her mood was not good, and she was easily angered.  (*Id*.)  She stated that she slept only 3 hours, ate once a day, and had low energy.  (*Id*.)  She was instructed to take her medications as prescribed.  (*Id*.)  She returned on March 22, 2007, and saw Nurse Practitioner (NP) Donna Greenman for irritability, persistent mood swings, and sudden anger.  (*Id*. at 1154.-55.)  She also reported difficulty completing projects, indecisiveness, and alternate periods of insomnia and excessive sleep.  (*Id*.)  She was depressed and thought of suicide.  (*Id*.)  On a brief bipolar disorder symptom scale (BBDSS), Plaintiff's symptoms ranged from not present (excitement and motor hyperactivity) to extremely severe (depression and personal hygiene).  (*Id*. at 1168.)  She showed severe emotional withdrawal and displayed moderately severe symptoms of hostility and anxiety.  (*Id*.)  She showed moderate signs of elevated mood, grandiosity, unusual thought content and blunted affect.  (*Id*.)  Her diagnosis

---

[4]  On May 10, 2007, Ralph Robinowitz, Ph.D., also a SAMC, affirmed Dr. White's PRT and mental RFC findings.  (R. at  817.)  He noted a medically determinable impairment of dysthmic disorder in partial remission.  (*Id*.)

[5]  Dr. White noted that Plaintiff had moderate limitations in each of these areas in his Summary Conclusions.  (R. at 804.)

was changed to mixed bipolar disorder.  (*Id*. at 1155.)  Her other diagnoses remained unchanged.  (*Id*.)  Plaintiff opposed adding lithium to her medications but agreed to a lithium trial.  (*Id*.)  She continued on paroxetine and alprazolam.  (*Id*.)

On April 24, 2007, Plaintiff again saw NP Greenman at Adapt for continued depression, insomnia, and mood swings.  (*Id*. at 1152.)  She reported that her energy level varied but was usually low, and that she had poor memory and appetite.  (*Id*.)  Plaintiff also described persistent suicidal thoughts but denied a definite plan.  (*Id*.)  NP Greenman noted that Plaintiff was alert and oriented, but that she still heard voices.  She increased Plaintiff's lithium dosage and continued her prescriptions for alprazolam and paroxetine.  (*Id*. at 1153.)  She saw Plaintiff again on May 31, 2007, for mood problems and insomnia.  (*Id*. at 1150.)  Plaintiff was alert and oriented, but her mood was depressed, and her affect was blunt.  (*Id*.)  NP Greenman continued her medications and added trazodone for sleep.  (*Id*. at 1151.)  She assessed Plaintiff's GAF at 40.  (*Id*.)  Plaintiff returned on July 12, 2007, with complaints of irritability, anger and depression.  (*Id*. at 1141.)  Her sleep had improved with the trazodone, but her energy and appetite were low.  (*Id*.)  She stated that she performed daily living activities as needed.  (*Id*. at 1143.)  Her affect was irritable and constricted.  (*Id*.)  NP Greenman continued her medications but increased her dosage of trazodone.  (*Id*. at 1142.)  On a BBDSS, Plaintiff's symptoms ranged from not present (elevated mood, grandiosity, unusual thought content, excitement, motor hyperactivity) to severe (emotional withdrawal and blunted affect).  (*Id*. at 1144.)  She appeared mildly anxious, and displayed moderate symptoms of hostility and depression.  (*Id*.)

On August 31, 2007, NP Greenman saw Plaintiff for depression, mood swings and irritability.  (*Id*. at 1126.)  Plaintiff had rapid thoughts, pacing, decreased sleep, and excessive appetite.  (*Id*. at 1126, 1128.)  She was alert and oriented.  (*Id*.)  NP Greenman continued Plaintiff's

prescriptions for lithium, paroxetine, alprazolam, and trazodone, and added Tegritol.  (*Id.* at 1127.)

She assessed her GAF at 40.  (*Id.*)  On a BBDSS, Plaintiff's symptoms ranged from not present

(elevated mood, grandiosity, unusual thought content, excitement, motor hyperactivity) to

moderately severe (depression and anxiety).  (*Id.* at 1129.)  She had moderate symptoms of hostility,

emotional withdrawal, and blunted affect.  (*Id.*)  Plaintiff returned on October 12, 2007, with

complaints of depressed mood and irritability.  (*Id.* at 1118.)  She described sadness, crying spells,

anxiety, lethargy and apathy.  (*Id.* at 1120.)  She was sleeping only 4 hours with trazodone.  (*Id.*)  NP

Greenman noted that Plaintiff was alert, her mood was ruminative, and her self-care was bad.  (*Id.*

at 1118, 1120.)  She continued her medications and assessed her GAF score at 40.  (*Id.* at 1119.)

On December 26, 2007, Plaintiff saw NP Greenman for worsened depression and abnormal

thoughts.  (*Id.* at 1114.)  She denied elevated mood but admitted to anger, hostility, irritability, and

racing thoughts.  (*Id.*)  She reported sadness, crying spells, lethargy, restlessness, and difficulty

concentrating.  (*Id.* at 1116.)  Her self-care was good, but she did not bathe.  (*Id.*)  NP Greenman

noted that Plaintiff had depressed affect.  (*Id.* at 1114.)  She continued Plaintiff's medications, but

increased her dosages of trazodone and Tegritol.  (*Id.* at 1115.)  She assessed her GAF score at 40.

(*Id.*)  Plaintiff returned on February 20, 2008, with complaints of depression.  (*Id.* at 1107.)  She

reported decreased irritability and improved sleep, but said she had no energy.  (*Id.*)  Plaintiff was

alert, but her affect was constricted.  (*Id.* at 1107.)  NP Greenman continued her medications.  (*Id.*

at 1108.)  On a BBDSS, Plaintiff's symptoms ranged from not present or not assessed (elevated

mood, grandiosity, excitement, motor hyperactivity) to severe (hostility).  (*Id.* at 1110.)  Plaintiff also

showed mild signs of unusual thought content and blunted affect, and displayed moderately severe

symptoms of depression and anxiety.  (*Id.*)  On April 21, 2008, Plaintiff saw NP Greenman for

decreased sleep, increased irritability, and racing thoughts.  (*Id.* at 1105.)  NP Greenman noted that

she was depressed and gave vague responses.  (*Id.*)  She continued her medications and assigned her a GAF score of 43.  (*Id.* at 1106.)

On May 28, 2008, Plaintiff saw Dr. Andre Graham with complaints of nausea and severe abdominal pain.  (*Id.* at 1238-39.)  He admitted her to BMC for observation.  (*Id.* at 821, 859, 1238-39.)  On May 29, 2008, Plaintiff underwent a sigmoidectomy and colostomy.  (*Id.* at 822.)  On May 30, 2008, Dr. Avian D. Kidd consulted on Plaintiff's case.  (*Id.* at 859.)  Plaintiff complained of increased anxiety and depressed mood.  (*Id.*)  She reported a history of multiple psychiatric medications and diagnoses including depression and bipolar disorder.  (*Id.*)  Dr. Kidd noted that she appeared depressed and anxious; he ordered Ativan by IV.  (*Id.* at 860-61.)  Plaintiff resumed her regular psychiatric medications after her IV was discontinued.  (*Id.*)  She was discharged on June 3, 2008, and instructed to follow-up with Dr. Graham.  (*Id.* at 828.)

On June 20, 2008, Plaintiff saw NP Greenman at Adapt for depression, mood swings, and irritability.  (*Id.* at 1090.)  She reported racing thoughts, bad dreams, and poor sleep. (*Id.*)  She was alert and oriented.  (*Id.*)  NP Greenman discontinued trazodone and continued Plaintiff's other medications.  (*Id.* at 1091.)  Plaintiff returned on September 2, 2008, with complaints of mood swings and depression.  (*Id.*)  Her energy level was better, and she was sleeping 4-6 hours nightly. (*Id.*)  She  described increased irritability, racing thoughts, and euphoria.  (*Id.*)  She was alert and oriented, but her mood was dysphoric.  (*Id.* at 1347.)  NP Greenman increased her lithium dosage, and discontinued Tegritol.  (*Id.*)  Plaintiff continued with paroxetine and Xanax.  (*Id.*)

On September 19, 2008, Plaintiff saw Richard R. Mount, Ph.D., a psychological consultant retained by her, for mental status and mental RFC exams.  (*Id.* at 1255-1272.)  He diagnosed her with Axis I  mixed bipolar disorder, somatoform disorder, and chronic post-traumatic stress disorder (PTSD).  (*Id.* at 1255, 1261.)  He also diagnosed an Axis II personality disorder.  (*Id.*)  He assigned

Plaintiff a GAF score of 40, and noted that her highest GAF in the past year was 40. (*Id.*) Plaintiff reported that she took lithium, Paxil and Xanax. (*Id.*) Dr. Mount noted symptoms of appetite disturbance with weight change, decreased energy, past attempts at suicide, feelings of guilt or worthlessness, somatization unexplained by organic disturbance, mood disturbance, difficulty thinking and concentrating, recurrent and intrusive recollections of a traumatic experience, psychomotor agitation, persistent disturbances of mood or affect, emotional withdrawal or isolation, visual hallucinations, emotional lability and manic syndrome. (*Id.* at 1256.)

In his mental status exam, Dr. Mount noted that Plaintiff was appropriately clothed, and her grooming was fair. (*Id.* at 1261.) She exhibited restless behavior, but her speech was relevant and coherent. (*Id.*) Her thought processes were goal directed. (*Id.*) She admitted to a past suicide attempt and low energy. (*Id.* at 1260-61.) She denied auditory hallucinations but admitted that she saw things others did not see. (*Id.* at 1261.) She appeared depressed and her mood was labile. (*Id.*) She was oriented as to time, place, and person. (*Id.*) Plaintiff had an average fund of information and intelligence. (*Id.*) Her remote memory was intact. (*Id.*) Plaintiff's immediate memory was also intact; she was able to recall 6 digits forward and 3 backwards. (*Id.*) She could not perform serial 7s, but she could do serial 3s. (*Id.*) However, on a test of delayed recall, Plaintiff remembered 0/5 words after 5 minutes. (*Id.*) Dr. Mount assessed Plaintiff's judgment and reasoning as logical and functional, and her insight as fair. (*Id.*) He administered the Millon Clinical Multiaxial Inventory-III. (*Id.* at 1264-72.) Results were consistent with tests and records showing that Plaintiff had bipolar disorder, and that she was overly focused on somatic complaints. (*Id.* at 1261.) She scored 69 on the PCL-C, a checklist for PTSD. (*Id.*) Her results also indicated paranoid and schizoid personality disorders. (*Id.*)

In assessing Plaintiff's ability to perform unskilled work, Dr. Mount opined that her ability

to understand and remember very short and simple instructions was limited but satisfactory, as was her ability to make simple work-related decisions and to ask simple questions or request assistance. (*Id*. at 1257.) Plaintiff was seriously limited, but not precluded, in her ability to remember work-like procedures and to maintain attention for two hour segments. (*Id*.) She was also seriously limited, but not precluded, in her ability to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instruction, and respond appropriately to criticism from supervisors. (*Id*.) Plaintiff was seriously limited, but not precluded, in her ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in a routine work setting. (*Id*.) Dr. Mount opined that she was unable to meet competitive standards in dealing with normal work stress. (*Id*.)

In assessing Plaintiff's ability to do semi-skilled and skilled work, Dr. Mount opined that Plaintiff was seriously limited, but not precluded, in her ability to understand, remember, and carry out detailed instructions, set realistic goals or make plans independently of others, and to deal with the stress of semi-skilled and skilled work. (*Id*. at 1258.) Her ability to adhere to basic standards of neatness and cleanliness was limited but satisfactory. (*Id*.) She was seriously limited, but not precluded, in her ability to interact appropriately with the general public, maintain socially appropriate behavior, travel in unfamiliar places, and to use public transportation. (*Id*.) Plaintiff's mental condition exacerbated her perception of pain and other symptoms, (*id*. at 1285), and that her impairments or treatment would cause her to miss work more than four days each month (*id*. at 1259). Her impairments had lasted at least twelve months and were reasonably consistent with the symptoms and functional limitations listed in his evaluation. (*Id*.) He concluded that Plaintiff was capable of managing any benefits she might be awarded. (*Id*.)

On December 18, 2008, Plaintiff saw NP Greenman at Adapt for depression, mood changes,

persistent racing thoughts, irritability, and an inability to complete tasks.  (*Id*. at 1341)  She also reported that she slept only 3-4 hours, but had no daytime sedation.  (*Id*.)  NP Greenman noted that Plaintiff's mood was dysphoric.  (*Id*.)  She continued her medications and assessed her GAF score as 42.  (*Id*. at 1342.)  Plaintiff returned on February 12, 2009, complaining of increased depression. (*Id*. at 1339.)  She had low energy, irritability, and racing thoughts.  (*Id*.)  She described some times when she could get work done.  (*Id*.)  NP Greenman increased Plaintiff's paroxetine dosage and continued her other medications.  (*Id*. at 1340.)  On April 8, 2009, Plaintiff presented with complaints of depression,  persistent irritability, and racing thoughts.  (*Id*. at 1337.)  She said that she had beaten her sister because she was trying to get a gun to hurt Plaintiff or her father.  (*Id*.)  NP Greenman noted that Plaintiff was alert and oriented; her mood was ruminative.  (*Id*.)  She continued her medications.  (*Id*. at 1338.)  Plaintiff returned on June 3, 2009, with complaints of irritability and depression.  (*Id*. at 1334.)  She was alert and oriented, but her mood was still ruminative.  (*Id*.)  NP Greenman reduced Plaintiff's paroxetine dosage and added sertraline.  (*Id*. at 1335.)  She continued her other medications.  (*Id*.)  NP Greenman saw Plaintiff again on August 15, 2009, for depression and irritability.  (*Id*. at 1332.)  Plaintiff had racing thoughts and reduced sleep.  (*Id*.)  NP Greenman described her mood as ruminative.  (*Id*.)  She increased Plaintiff's dosages of sertraline and lithium, and continued her alprazolam.  (*Id*. at 1333.)

On September 15, 2009, Plaintiff saw Dr. Felty.  (*Id*. at 1356.)  She noted that Plaintiff's affect was depressed and flat.  (*Id*.)

On September 30, 2009, Plaintiff returned to NP Greenman at Adapt, complaining of depression, irritability, low energy, and racing thoughts.  (*Id*. at 1330).  She stated that she was sleeping only 3-4 hours and she did not feel rested.  (*Id*.)  NP Greenman noted that Plaintiff was alert and oriented; her thought processes were logical and organized.  (*Id*.)  She increased Plaintiff's

sertraline dosage and continued her lithium and alprazolam medications.  (*Id*. at 1331.)  NP Greenman saw her again on November 24, 2009, for depression and low energy.  (*Id*. at 1326.)  NP Greenman noted that Plaintiff was alert and oriented, and her thought processes were logical and organized.  (*Id*.)  She reduced Plaintiff's lithium dosage slightly and continued her other medications. (*Id*. at 1327.)

On May 20, 2010, Plaintiff saw Dr. Katherine S. Donaldson for a mental status exam.  (*Id*. at 1291-1304.)  Dr. Donaldson diagnosed Plaintiff with Axis I bipolar disorder and PTSD.  (*Id*. as 1299.)  She diagnosed no Axis II disorders.  (*Id*.)  She assigned Plaintiff a GAF score of 51.  (*Id*.) Dr. Donaldson noted that Plaintiff described a history of episodes consistent with bipolar disorder. (*Id*. at 1292.)  Her symptoms included sadness, not enjoying activities any longer, increased appetite, trouble sleeping, psychomotor retardation, lack of energy, feelings of worthlessness and guilt, difficulty concentrating, and thoughts of death.  (*Id*.)  Plaintiff described times of abnormal and persistently elevated or irritable moods, when she was very talkative and had racing thoughts.  (*Id*.) She described episodes of impulsive behavior.  (*Id*.)  Dr. Donaldson noted that Plaintiff's symptoms caused significant impairment in social, occupational, and other areas of functioning.  (*Id*.)

Plaintiff reported that her PTSD was related to her history of sexual abuse and rape.  (*Id*.) She described feelings of fear and helplessness, and reported that she persistently re-experienced her molestation and rape through memory, dreams and exposure to cues that reminded her of the trauma. (*Id*.)  She reported avoiding situations, people, feelings and conversations that reminded her of her trauma, and described feeling detached from others.  (*Id*.)  Plaintiff also described increased arousal, including problems with sleep, irritability, anger, concentration, hyper-vigilance and exaggerated startle response.  (*Id*. at 1293.)  Dr. Donaldson concluded that Plaintiff's symptoms significantly impaired her ability to function socially, occupationally and in other areas.  (*Id*.)  She noted that

Plaintiff displayed poor eye contact but seemed attentive to questions. (*Id*. at 1295.) Her speech was normal, and she responded coherently. (*Id*.) Dr. Donaldson noted no evidence of a thought disorder, but Plaintiff's score on the mental status exam was 22/30, which indicated mild cognitive impairment. (*Id*.) She showed no signs of delusional thinking, or evidence that she attended to any kind of hallucination. (*Id*. at 1295-96.) Plaintiff was alert and oriented, but her mood was depressed and her affect was constricted. (*Id*.) She displayed adequate short and long term memory, but her intermediate recall was limited. (*Id*. at 1296-97.) Dr. Donaldson noted that Plaintiff's attention and concentration were limited. (*Id*. at 1297.) She found that Plaintiff's judgment was adequate in hypothetical situations, but that she evidenced poor judgment in real-life situations and displayed limited insight in how to deal with her symptoms. (*Id*.) Plaintiff scored 88 on the Weschsler Adult Intelligence Scale, which placed her in the low average range. (*Id*.) On an achievement test, Plaintiff's word reading and sentence comprehension were average, but she was below average on math and reading. (*Id*. at 1298-99.)

Dr. Donaldson also completed a statement of ability to perform mental work-related activities. (*Id*. at 1302-1304.) She opined that Plaintiff was mildly limited in her ability to understand, remember, and carry out simple instructions, and to make judgments on simple-work-related decisions. (*Id*.) Plaintiff was markedly limited in her ability to understand, remember and carry out complex instructions, and to make judgments on complex work-related decisions. (*Id*.) She was moderately limited in her ability to interact appropriately with the public, supervisors, and co-workers. (*Id*.) Plaintiff was markedly limited in her ability to respond appropriately to work situations and changes in a routine work setting. (*Id*.) Dr. Donaldson opined that Plaintiff was able to manage benefits. (*Id*. at 1303-04.)

On June 8, 2010, Dr. Felty completed a physical RFC questionnaire. (*Id*. at 1439-43.) She

noted multiple office visits since May 2008, and diagnoses of diabetes, bipolar disorder, hypertension, sleep apnea, and hernia. (*Id*.) She also noted abdominal pain, fatigue, and foot pain related to diabetic neuropathy. (*Id*. at 1439.) Dr. Felty noted that Plaintiff's psychiatric medications caused drowsiness, and that she had narcolepsy and sleep apnea. (*Id*.) She opined that emotional factors affected Plaintiff's physical condition, and noted that she suffered from depression. (*Id*. at 1440.) Plaintiff's impairments were consistent with the symptoms and limitations described in her statement, and that she had frequent problems with attention and concentration as a result of her symptoms. (*Id*.) Dr. Felty noted that she could not assess Plaintiff's ability to tolerate work stress or her functional limitations in a competitive work situation due to limitations in the clinic setting. (*Id*. at 1440-1442.)

On June 18, 2010, Dr. Felty completed a clinical assessment of Plaintiff's pain. (*Id*. at 1444.) She opined that Plaintiff's pain was extensive enough to distract from adequate performance of daily activities or work. (*Id*.) She also opined that activities such as walking, standing, sitting, bending, stooping, and moving extremities increased her pain to such an extent that she would be distracted from tasks or abandon them completely. (*Id*.) Finally, Dr. Felty noted that Plaintiff's medications caused severe side effects and opined that distraction, inattention, drowsiness, etc., limited her effectiveness. (*Id*. at 1445.)

### 3.    Hearing Testimony[6]

On September 16, 2008, Plaintiff and a vocational expert testified at a hearing before the ALJ (*Id*. at 46-93.) At the supplemental hearing before the ALJ on July 1, 2010, Plaintiff, two medical experts, and a vocational expert testified. (*Id*. at 96-165.) Plaintiff was represented by an attorney

---

[6] As noted, the two issues in this appeal relate to the findings concerning Plaintiff's mental limitations. The recitation of hearing testimony is therefore limited to the relevant testimony concerning her mental limitations.

at both hearings.  (*Id*. at 46, 94. )

### a.      *Plaintiff's Testimony at the First Hearing*

Plaintiff testified that she was 53 years old and divorced.  (*Id*. at 51-52.)  She lived with her 77-year-old father and 6-year-old niece.  (*Id*. at 51.)  Her height was 5' 6" and she weighed 246 pounds.  (*Id*. at 52-53.)

Plaintiff was a licensed nail technician and had owned her own beauty salon for 20 years, but she stopped working in that field because she had trouble with her hands.  (*Id*. at 53-54, 82-83.)  She went to college after that and earned associate's degrees in criminal justice, paralegal studies, and corrections.  (*Id*. at 54.)  After she graduated in May 2004, she worked for CiviGenics, a federal holding facility.  (*Id*. at 54.)  She made $6.25/hour when she started as a jailer, and over $10/hour as a sergeant.  (*Id*. at 55, 78.)  She was responsible for 200 to 300 inmates, and her job involved a lot of paperwork.  (*Id*. at 55.)  Her job duties required sitting and standing, and she had to be able to physically restrain inmates.  (*Id*.)  She was discharged from her position on July 3, 2006, because she fell asleep at work.  (*Id*. at 55, 78.)

Plaintiff  received benefits through December 2006, and did not look for a job due to her depression.  (*Id*. at 79.)  She had not worked since July 3, 2006, but she received a small check from Jackson Healthcare Systems for taking care of her paralyzed stepmother.  (*Id*. at 77-78.)  Her stepmother entered a nursing home a few weeks before the hearing.  (*Id*. at 77.)  Plaintiff  took care of her father and niece.  (*Id*. at 77.)

Plaintiff's stepfather molested her between the ages of 8 and 15.  (*Id*. at 58-59.)  She thought about the abuse daily, and she got angry and cried.  (*Id*. at 59.)  Her emotional episodes lasted from a day to a week when they occurred, and she stayed in her room during that time.  (*Id*. at 59-60.)  She thought about the sexual abuse at night or when TV programs reminded her of it, and it affected her

sleep. (*Id*. at 61, 63.)  The episodes occurred when she worked at the corrections facility, and they affected her ability to perform her job because she could not stand to be around the child molesters. (*Id*. at 60-61.)  She also had short-term memory and concentration problems that affected her job performance because she forgot to complete paperwork and to arrange for prisoner transports.  (*Id*. at 64-66.)

Dr. Ricardo Schack, a psychiatrist, treated Plaintiff for depression and anxiety previously. (*Id*. at 58, 79-80.)  She began treatment at Adapt in January 2007.  (*Id*. at 58, 79.)  There, she was diagnosed as bipolar with psychotic features, e.g., she became violent when provoked.  (*Id*. at 58.) Plaintiff took 1200 milligrams of lithium, 40 milligrams of Paxil and 3 milligrams of Xanax daily. (*Id*. at 62.)  The Xanax was for panic attacks, which occurred when she drove or thought about the past molestation.  (*Id*. at 62-63.)  Medication helped, but she still had symptoms of depression.  (*Id*. at 63.)  She still thought about the molestation, and continued to isolate herself.  (*Id*. at 63-64.)

Plaintiff went to bed at 10:00 and got up at 6:00.  (*Id*. at 73.)  She woke up all night and only slept about 4 hours.  (*Id*.)  When she got up, she made coffee and returned to her room to avoid people.  (*Id*.)  She made her father's bed, swept, and mopped, but it took all day because she had back pain.  (*Id*. at 73-74.)  She cooked and shopped sometimes.  (*Id*. at 74-75.)  She had difficulty bathing and dressing because it was painful to get in and out of the bathtub and to get dressed.  (*Id*. at 75-76.)  She had no hobbies or friends, was not a social person, and did not know her neighbors. (*Id*. at 64, 75.)

      **b.**    ***Second hearing***

           **i.**    ***Plaintiff's Testimony***[7]

---

[7]  Because Plaintiff's testimony at the second hearing was essentially the same as at the first hearing, only new or amplified testimony about her mental impairments is included in the recitation.

Plaintiff testified that Adapt Healthcare treated her bipolar disorder and PTSD. (*Id.* at 139-40.) She took lithium, which was prescribed to help with her rage. (*Id.*) She never got over being sexually abused and raped by her stepfather and was easily provoked. (*Id.*) Her sister came to the house drunk, and Plaintiff beat her so badly that she had to go to the hospital. (*Id.*) Her stepfather drank, and she did not like drunks or being around drunks and could not stand the smell of alcohol. (*Id.* at 141.) Her rage impacted her job as a correctional officer because she could not stand the inmates who were child molesters. (*Id.* at 142-43.) Rage was not a problem anymore because she did not leave her room very often. (*Id.*) She thought about the abuse every day, and it made her sick at her stomach. (*Id.* at 143-44.)

Adapt also treated Plaintiff for anxiety and panic attacks. (*Id.* at 146.) She had panic attacks when she drove or got upset. (*Id.* at 144.) She also had panic attacks while in her room, and she could not shut her door because she felt closed in. (*Id.* at 144-45.) She testified that she had panic attacks when she saw Mexicans, because her stepfather was Mexican. (*Id.* at 145.) During a panic attack, her chest got heavy and she hyperventilated. (*Id.* at 145-46.) Her attacks lasted until her medication began working, around 30 minutes. (*Id.* at 146.) In the past, she took Xanax only when she had an attack. (*Id.*) Adapt had prescribed Xanax three times a day to prevent attacks, and her attacks occurred less frequently. (*Id.* at 146-47.)

### ii.    *Dr. Jonas' Testimony*

Dr. Alfred Jonas, a psychiatrist, testified by telephone based on the medical records. (*Id.* at 95, 97, 99.) He identified key points in the records as the diagnoses of dysthymic disorder, bipolar disorder, PTSD, and personality disorder. (*Id.* at 102-03.) He opined that there was little basis for a finding of bipolar disorder since it was unclear that Plaintiff experienced an identifiable episode of mania. (*Id.* at 103.) He conceded that there were reports of symptoms related to mania, but those

appeared in the history, and there was no specific finding of a manic episode. (*Id*.) The medical record supported the diagnoses of PTSD and personality disorder. (*Id*. at 103.)

He opined that Plaintiff's conditions caused no impairment or only mild impairment in daily living activities, since she drove and managed her own finances. (*Id*. at 104.) She had no impairment or only mild impairment in social function, although it was hard to tell from the record. (*Id*.) She was not impaired or only mildly impaired as to concentration, persistence and pace, but he conceded that her mental status exams were inconsistent. (*Id*.) The record showed no episodes of deterioration in Plaintiff's functional settings. (*Id*.) Dr. Jonas opined that Plaintiff had no impairments that met or equaled any listing between July 2006 through September 30, 2008, and her mental impairments had not significantly affected her RFC. (*Id*. at 105-06.)

On cross-examination, Dr. Jonas testified that he did not have the records from Adapt Healthcare from September 2008 to November 2009. (*Id*. at 106.) He testified that lithium was used to treat bipolar disorder, alprazolam was an anxiety medication, and sertraline was an antidepressant. (*Id*. at 107.) Doctors prescribed lithium and sertraline to patients believed to have bipolar disorder and depression, and alprazolam for patients who were anxious. (*Id*.) He did not know what medications Plaintiff had taken. (*Id*. at 107-108.) Plaintiff's reports of sexual abuse, rape, a suicide attempt at 16, and six marriages were sufficient to suspect a PTSD dynamic. (*Id*. at 108.) Drs. Donaldson and Mount had diagnosed Plaintiff with chronic PTSD, and her reported symptoms were consistent with PTSD. (*Id*. at 108-109.) He opined that PTSD symptoms could affect a person's concentration, persistence, and pace at the time of a triggering event, but would not cause chronic impairment. (*Id*.) He also opined that PTSD symptoms could affect a person's social function. (*Id*. at 110.) Finally, he testified that he could not predict how long a particular episode of PTSD might affect concentration, persistence, pace, or social function because it varied from

22

person to person, and tended to improve with time even if it never resolved completely.  (*Id.*)

### iii.   *Dr. Snowden's Testimony*

Dr. Snowden, a vocational expert (VE), also testified at the hearing.  (*Id.* at 152-65.)  The ALJ asked her opinion of whether a hypothetical person closely approaching advanced age with Plaintiff's education and work experience, and who was ambidextrous, could perform Plaintiff's past relevant work with the following limitations: lift and carry 20 pounds occasionally; 10 pounds frequently; stand 2 out of 8 hours; walk 2 out of 8 hours; sit 6 of 8 hours; never work overhead with her left upper extremity; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, balance, stoop, and crouch; and never drive or work in close proximity to hazardous moving machinery.  (*Id.* at 153.)  The VE opined that the hypothetical person could perform Plaintiff's past relevant work as a salon manager, which was light work with an SVP of 7, and as a nail technician, which was sedentary work with an SVP of 3.  (*Id.* at 153, 157, 164.)  The ALJ also asked whether there were entry level jobs which existed in significant numbers in the national economy that a hypothetical person with the same limitations could have performed between July 2006 and September 2008.  (*Id.* at 154.).  The VE stated that there were entry-level jobs which existed in significant numbers in the national economy that the hypothetical person could have performed during the relevant period.  (*Id.*)  She identified the jobs of bench assembler, with 141,000 jobs in the national economy and 5,200 jobs in Texas; bench inspector, with 128,000 jobs in the national economy and 9,400 in Texas; and jobs in the sorter group, with 70,000 jobs in the national economy and 7,300 jobs in Texas.  (*Id.* at 154-55.)  She explained that she adjusted the numbers to reflect a sit/stand option, and that her testimony was consistent with the DOT, except that it did not address the sit/stand option.  (*Id.*)

On cross-examination, Plaintiff's counsel asked the VE whether a hypothetical person with

frequent pain or other symptoms severe enough to interfere with the attention and concentration necessary for simple tasks could perform Plaintiff's past relevant work or the entry level jobs she identified. (*Id*. at 157.) She responded that the hypothetical person would not be able to maintain employment. (*Id*.) Counsel then asked whether a hypothetical person would be able to perform Plaintiff's past relevant work or the entry level jobs if she had pain severe enough to distract from adequate performance of daily work activities, and physical activities such as walking, standing, sitting, bending, stooping, and moving her extremities increased her pain to such a degree as to cause distraction or total abandonment of tasks. (*Id*. at 157-58.) The VE opined that the pain would limit the person's ability to maintain employment or preclude employment entirely. (*Id*. at 158.)

Plaintiff's counsel also asked whether a hypothetical person who had sufficient ability to reason and make personal adjustments, but who had difficulty making occupational and social adjustments would be able to perform Plaintiff's past work or other work. (*Id*.) The VE stated that those limitations would not have as big an impact on the hypothetical person's ability to perform her past work, but would impact her ability to perform new or different work. (*Id*.) She distinguished Plaintiff's past work as more familiar, predictable and routine. (*Id*.) In response to a question regarding the impact of such limitations on a hypothetical person's ability to perform Plaintiff's past relevant work given the social contact involved, the VE opined that the limitations described would impact the hypothetical person's ability to perform Plaintiff's past relevant work. (*Id*. at 158-59.)

When asked whether a hypothetical person with the limitations described by the ALJ, and who could only push and pull with the left hand occasionally, would be able to perform Plaintiff's past relevant work or the other jobs she had described, the VE opined that the hypothetical person could perform Plaintiff's past relevant work and the entry level jobs. (*Id*. at 159-60.)

When counsel inquired whether a hypothetical person who could not meet competitive

standards regarding her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms could perform Plaintiff's past relevant work or other work, the VE opined that the hypothetical person would be precluded from employment. (*Id*. at 161.) Counsel asked whether a hypothetical person who experienced panic attacks lasting 30 minutes, the frequency of which varied from two times per month to three times a week, could perform Plaintiff's past relevant work or other work. (*Id*. at 162-63.) The VE responded that the hypothetical person could perform Plaintiff's past relevant work or other work if the attacks occurred only a few times a month, but if the attacks were frequent, ongoing and unmanageable, it could preclude employment. (*Id*. at 163.) When asked whether a hypothetical person who was seriously limited and unable to meet competitive standards in her ability to deal with work stress could perform Plaintiff's past relevant work or other work, the VE stated that such a limitation would not preclude employment, but it might impact the hypothetical person's ability to maintain employment. (*Id*. at 161.)

Counsel asked the VE whether a hypothetical person who was unable to meet competitive standards regarding her ability to sustain a routine without special supervision could perform Plaintiff' past relevant work or other work. (*Id*.) The VE opined that the limitation would be considered a job accommodation, not regular competitive employment. (*Id*.) Counsel also asked whether a hypothetical person who was seriously limited in her ability to perform at consistent pace without an unreasonable number and length of rest periods could perform Plaintiff's past relevant work or other work. (*Id*. at 161-62.) The VE concluded that the limitation would be considered an accommodation, not competitive employment. (*Id*. at 162.)

In response to a question about whether a hypothetical person who was seriously limited in her ability to accept instruction, and respond appropriately to criticism could perform Plaintiff's past relevant work or other work, the VE opined that such a limitation would not preclude employment,

but it might impact the hypothetical person's ability to keep a job.  (*Id*.)

Counsel also asked whether a hypothetical person who was unable to meet competitive standards regarding attendance and punctuality within customary tolerances could perform Plaintiff's past relevant work or other work.  (*Id*. at 160.)  The VE responded that the limitations described would impact the hypothetical person's ability to maintain employment, and could preclude employment entirely.  (*Id*.)  Finally, counsel asked whether a hypothetical person who would be absent from work more than 4 days per month as a result of her impairments would be able to perform Plaintiff's past relevant work or other work.  (*Id*. at 163.)  The VE opined that the hypothetical person would not be precluded from working but would probably lose her job due to absenteeism.  (*Id*.)

## C.    *ALJ's Findings*

The ALJ denied Plaintiff's application for benefits by written opinion issued on August 24, 2010.  (*Id*. at 13-29.)  At step 1, the ALJ found that Plaintiff was fully insured for disability under Title II at the time her alleged disability began, but she remained insured only through September 30, 2008.  (*Id*. at 14.)  He also found that Plaintiff had not engaged in substantial gainful activity since July 30, 2008.  (*Id*. at 14.)  At step 2, the ALJ found that Plaintiff had the following severe impairments prior to the expiration of her insured status: degenerative disc disease of the cervical and lumbar spine, hypothryroidism with a history of Graves' disease, small hiatal hernia, obstructive sleep apnea, periodic limb movement disorder, chronic bronchitis, obesity, possible narcolepsy, impairment status-post large bowel obstruction, impairment status-post sigmoid colon resection and colostomy, and impairment status-post surgery for reversal and closure of the colostomy.  (*Id*. at 15.)  He found that the following mental impairments alleged by Plaintiff prior to the expiration of her insured status were not severe: bipolar disorder, major depression, panic disorder, dysthymic

disorder, PTSD, and personality disorder.  (*Id.*)  At step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 21.)

The ALJ determined that Plaintiff had the residual functional capacity to work at the light exertional level, as defined in 20 C.F.R. § 416.967(b), with the following limitations: lift and carry 20 pounds occasionally and 10 pounds frequently; stand 2 hours, walk 2 hours and sit 6 hours in an 8-hour workday; never climb ladders, scaffolds or ropes; occasionally climb ramps and stairs, balance, stoop, and crouch; never work overhead with her left upper extremity; never drive or be exposed to hazards. (*Id.*)  The ALJ also found that Plaintiff could work full-time on a sustained basis and maintain employment for an indefinite time period.  (*Id.*)

At step 4, the ALJ found that Plaintiff was not capable of performing her past relevant work prior to the last date insured.  (*Id.* at 27.)  He then found that she was classified as a person closely approaching advanced age.  (*Id.* at 28.)  Plaintiff had a GED and associate's degrees and was able to communicate in English.  (*Id.* at 28.)  He found transferability of job skills immaterial to the disability determination due to her age. (*Id.*)  At step 5, the ALJ determined that there were jobs that Plaintiff could perform which existed in significant numbers in the national economy, such as bench assembler, with 5,200 jobs in Texas and 141,000 in the national economy; bench inspector, with 9,400 jobs in Texas and 128,000 jobs in the national economy; and sorter, with 7,300 jobs in Texas and 70,000 in the national economy.  (*Id.* at 28-29.)  Accordingly, he determined that Plaintiff was not disabled within the meaning of the Social Security Act at any time prior to the expiration of her insured status on September 30, 2008.  (*Id.* at 29.)

## II. ANALYSIS

**A.**    *Legal Standards*

**1.     Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination under a claim for disability benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id*. at 436 and n. 1.

## 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as

defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64.  The definition of disability under

the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only

prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status."

*Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special

earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*,

770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential 5-step analysis to determine whether a claimant is

disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. §

404.1520(b)-(f)).  Under the first 4 steps of the analysis, the burden lies with the claimant to prove

29

disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first 4 steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step 5 to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3. Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision and award benefits. (Doc. 17 at 23.) When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, at *10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id*. at *11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005) (per curiam). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

### B. *Issues for Review*

Plaintiff raises the following issues for review:

1.    Did the Defendant Commissioner properly evaluate the opinion evidence of record in determining Plaintiff's residual functional capacity?

2.    Does substantial evidence support the Commissioner's decision that Plaintiff was not suffering from a vocationally significant mental disorder on and before the date last insured?

(Pl.MSJ at 3.)

**C.    *Severity of Plaintiff's Mental Impairments*[8]**

Plaintiff contends that the ALJ's finding that her mental impairments were not severe was not supported by substantial evidence.  (*Id*. at 20.)

In the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).  In addition to this standard that is used to evaluate all impairments, the Social Security Regulations provide even more precise standards for evaluation of the severity of mental impairments.  *See* 20 C.F.R. § 404.1520a.  The evaluation process is often referred to as "the technique" or the "special technique." *Westover v. Astrue*, No. 4:11-CV-816-Y, 2012 WL 6553102, at *8 (N.D. Tex. Nov. 16, 2012), *adopted by* 2012 WL 6553829 (Dec. 13, 2012) (citing 20 C.F.R. § 404.1520a).  Specifically, once the ALJ finds that a claimant has a mental impairment, he "must then evaluate the degree of functional loss resulting from the impairment in four separate areas deemed essential for work." *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) (citing 20 C.F.R. § 404.1520a(c)(3)).  These functional areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of

---

[8]  Because the severity issue arises at Step 2 of the sequential evaluation process, the Court considers this issue before the residual functional capacity issue, which arises after Step 3.

decompensation.[9]

After rating the degree of functional limitation, the ALJ determines the severity of the mental impairment.  20 C.F.R. § 404.1529a(d).  If the degrees of limitation in the first three areas are "none" or "mild", and the degree of limitation in the fourth area is "none," "the ALJ must find the impairment 'not severe,' which generally concludes the analysis and terminates the proceedings."  *Boyd*, 239 F.3d at 705 (citing to 20 C.F.R. § 404.1520a(d)(1)).  If the ALJ finds that the mental impairment is severe at step two, he must determine at step three if it meets or medically equals a listed impairment.  20 C.F.R. § 404.1520a(d)(2).  If the impairment does not meet or equal a listed impairment, the ALJ must conduct an RFC assessment.  *Id.*; 20 C.F.R. § 404.1520a(d)(3); *Boyd*, 239 F.3d at 705.  "The ALJ's written decision must incorporate pertinent findings and conclusions based on the technique and must include a specific finding of the degree of limitation in each of the functional areas described."   *Westover*, 2012 WL 6553102, at *8 (citing 20 C.F.R. § 404.1520a(e)(4)).

Here, the ALJ acknowledged Plaintiff's diagnoses of bipolar disorder, major depression, panic disorder, dysthymic disorder, post-traumatic stress disorder, and personality disorder, but found that the impairments were not severe.  (R. at 15.)  The ALJ's finding of non-severity was based in part on the hearing testimony of Dr. Jonas, who opined that the medical evidence of record showed no functional limitations in the four relevant areas.  (*Id.*)  The ALJ also engaged in a lengthy analysis of the medical records, medical source statements, and opinion testimony in applying the PRT.  (*Id.* at 15-20.)  He assessed Plaintiff's activities of daily living, and noted that she was capable

---

[9]   These four functional areas are known as the "paragraph B criteria."  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C.  The first three are rated on a five-point scale, as either none, mild, moderate, marked, or extreme, and the fourth is rated on a four-point scale, ranging from "none" to "four or more episodes."  *See* 20 C.F.R. § 404.1520a(c)(4).

of dressing and bathing, performing light household shores, cooking, managing funds and shopping, caring for her father and stepmother, and watching TV. (*Id*. at 17-18, 20.)  He noted that she was able to read the paper, utilize the postal service and telephone directories. (*Id*. at 17, 20.)  As to social function, he noted that Plaintiff characterized herself as a loner, but that she was happy, animated and joking, friendly and easily engaged in meetings with her caseworker. (*Id*. at 18.)  The ALJ also noted that her thought processes were relevant and goal-directed, and she had no difficulty remaining topic-orientated during interviews. (*Id*. at 17.)  Tests of her immediate recall fell within the average range, as did her intellectual function. (*Id*.)  Other records indicated that Plaintiff was focused and attentive, and her conversation was relevant and coherent. (*Id*. at 18, 20.)  On other occasions, her judgment and reasoning were logical and functional, and her insight was fair. (*Id*. at 20.)  He concluded that Plaintiff had no more than mild restrictions in the activities of daily living, social functioning, and maintaining concentration, persistence, or pace, and that she had no episodes of decompensation. (*Id*.)  As a result, the ALJ concluded that Plaintiff's mental impairments were not severe. *See* 20 C.F.R. § 404.1520a(d)(1).

Plaintiff argues that the ALJ improperly favored the opinion of a non-examining medical expert who was not present at the hearing, did not hear her testimony, and did not have all her treatment records. (Doc. 17 at 4, 10, 13-14, 21.)  The ALJ did not ignore the medical evidence from Plaintiff's treating and examining sources, however.  He relied on it to find that Plaintiff had the medically determinable impairments of bipolar disorder, major depression, panic disorder, dysthymic disorder, post-traumatic stress disorder, and personality disorder (R. at 15.)  Additionally, the ALJ also relied on medical notes from examining and treating sources to find that her mental impairments were not severe. (*Id*. at 15-20.)  While the ALJ should accord great weight to the opinion of treating or examining physicians, the opinion of any physician may be rejected if the evidence supports a

33

contrary conclusion or is inconsistent with other substantial evidence of record. *See Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (per curiam); *Spellman v. Shalala*, 1 F.3d 357, 364-65 (5th Cir. 1993). The ALJ's finding of non-severity was supported by substantial evidence, and remand is not required on this issue.

**D.     *Residual Functional Capacity***

Plaintiff contends that the ALJ's RFC determination was not supported by substantial evidence because he failed to properly consider the effect of her mental impairments in assessing her residual functional capacity. (Doc. 21 at 7.) Specifically, she asserts that he did not properly evaluate the medical opinions in the record. (*Id*. at 13, 19-20.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1) (2003). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). Consideration of all "medically determinable impairments . . . including [those] that are not 'severe'" is required by the regulations when determining a claimant's RFC. *See* 20 C.F.R. § 404.1545(a)(2) & (e). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184,

at *1.  The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Lagged*, 67 F.3d at 564.  Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Id.*  A "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision.  *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, at step 2, the ALJ acknowledged Plaintiff's diagnoses of bipolar disorder, major depression, panic disorder, dysthymic disorder, PTSD, and personality disorder, but found that the impairments were not severe.  (R. at 15.)  The ALJ found that Plaintiff had severe physical impairments, but determined that none of her impairments met or equaled a listed impairment pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*. at 15, 21.)  Therefore, the ALJ proceeded to assess Plaintiff's RFC.  (*Id*. at 21-26.)  He found that she had the RFC to perform work at the light exertional level, as defined in 20 C.F.R. § 416.967(b), with the following limitations: lift and carry 20 pounds occasionally and 10 pounds frequently; stand 2 hours, walk 2 hours and sit 6 hours in an 8-hour workday; never climb ladders, scaffolds or ropes; occasionally climb ramps and stairs, balance, stoop, and crouch; no overhead work with her left upper extremity; and no driving or exposure to hazards such as dangerous moving machinery.  (*Id*. at 21.)  Neither the ALJ's RFC

assessment nor his RFC narrative discussion[10] considered whether Plaintiff's acknowledged mental impairments limited her ability to perform mental work-related activities.[11] (*Id*. at 21-26.) Instead, he only addressed physical limitations on Plaintiff's ability to work. (*Id*.) His limited discussion of Plaintiff's mental impairments substituted discussion of Plaintiff's functional limitations (relevant to his application of the PRT at step 2) with the more detailed analysis required in determining Plaintiff's mental RFC at steps 4 and 5. (*Id*. at 23.) For example, the ALJ discussed Plaintiff's daily living activities, and then concluded that they were consistent with the ability to perform at least light work. (*Id*.) He failed to consider the mental RFC opinions of Drs. White, Mount and Donaldson.[12] (*Id*. at 21-26.) Therefore, the ALJ committed legal error because he failed to consider all of Plaintiff's impairments as required by 20 C.F.R. § 404.1545(a)(2) & (e).

In the Fifth Circuit, "[v]iolation of a regulation constitutes error, and will constitute a basis for reversal of agency action and remand when a reviewing court concludes that the error is not harmless." *Pearson v. Barnhart*, 2005 WL 1397049, at *4 (E.D. Tex. May 23, 2005) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp.2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622

---

[10] The ALJ's step 2 narrative did discuss Dr. Jonas' conclusion that Plaintiff's mental RFC was unrestricted, the mental RFC form completed by the SAMC, and Dr. Mount's opinion as to Plaintiff's mental RFC. (R. at 15, 18-19.) At step 2, however, the relevant inquiry is the severity of a claimant's impairments. At that stage, the ALJ is to apply the special technique to determine the extent of Plaintiff's functional limitations. SSR 96-8P, 1996 WL 374184, at *5 (S.S.A. July 2, 1996). RFC is only relevant at steps 4 and 5. 20 C.F.R. § 404.1545(a)(5)(i)-(ii); SSR 96-8P, 1996 WL 374184, at *3.

[11] Those activities include: understanding, remembering and carrying out instructions; using judgment in work-related decisions; responding appropriately to supervision, co-workers and work situations; and dealing with changes in a routine work setting. *See* 20 C.F.R. § 1545(c); SSR 96-8P, 1996 WL 374184, at *3.

[12] Dr. White only expressed an opinion of what Plaintiff *could* do and did not expressly state his opinion regarding what she could not do.

36

(5th Cir. 2003)).

Here, the ALJ's RFC assessment addressed only Plaintiff's physical impairments, and his RFC narrative discussion focused on Plaintiff's physical impairments.  He failed to consider the mental RFC opinions of Drs. White, Mount and Donaldson.[13]  Dr. Mount opined that Plaintiff 's ability to perform work-related mental activities was seriously limited in several areas.  (*Id*. at 1257-59.)  Dr. Donaldson's opinions, though rendered after Plaintiff's insured status had expired, were consistent with those of Dr. Mount.  (*Id*. at 1302-04.)  Had the ALJ considered this evidence, he may have included some mental restrictions when assessing Plaintiff's RFC.  Moreover, when Plaintiff's counsel incorporated the limitations recognized by these doctors into his hypothetical questions, the VE often opined that the described limitations would impact the ability to maintain employment, or preclude employment altogether.  (*Id*. at 87-91.)  It is therefore not inconceivable that the ALJ's disability determination might have been different had he properly considered Plaintiff's ability to engage in work-related mental activities.  *Frank*, 326 F.3d at 622; *Bornette*, 466 F. Supp.2d at 816. Accordingly, the case must be remanded to the Commissioner for reconsideration of Plaintiff's RFC.

---

[13]  Dr. White only expressed an opinion of what Plaintiff *could* do, and did not expressly state his opinion regarding what she could not do.

### III.  CONCLUSION

Plaintiff's motion for summary judgment is **GRANTED** in part, Defendant's motion for

summary judgment is **DENIED** in part, and the case is **REMANDED** for reconsideration.

**SO ORDERED.**

DATED:        March 18, 2013.


_____
BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS